[No. 78247-4. En Banc.]
Argued February 13, 2007. Decided April 3, 2008.

PARDNER WYNN, *Respondent*, v. JOLENE EARIN ET AL., *Petitioners*.

*Christopher J. Kerley* and *James B. King* (of *Evans, Craven & Lackie, PS*) and *Mary H. Spillane* (of *Williams Kastner & Gibbs*), for petitioners.

*Mary E. Schultz* (of *Mary Schultz Law, PS*), for respondent.

¶1 MADSEN, J. — Petitioner Jolene Earin provided counseling to respondent Pardner Wynn, individually and then jointly with his wife. The Wynns divorced, and Ms. Earin provided information obtained during the counseling to the guardian ad litem for the children. She also appeared and testified on Ms. Wynn's behalf at the hearing to determine child placement. Mr. Wynn sued Ms. Earin for emotional distress resulting from alleged violations of the Uniform Health Care Information Act (Health Care Information Act or Act), chapter 70.02 RCW, and for negligence, alleging violations of the standard of care for mental health counselors. The trial court concluded Ms. Earin was entitled to absolute witness immunity from suit for any claims based on her testimony. On appeal, the Court of Appeals reversed, holding that witness immunity does not apply to confidential health care information disclosed in contravention of the Health Care Information Act or to information obtained in a prelitigation professional relationship formed for nonlitigation purposes.

¶2 We conclude that witness immunity does not apply to information disclosed in violation of the Health Care Information Act and affirm this ruling of the Court of Appeals. However, we reverse the Court of Appeals' holding that witness immunity does not apply to testimony relating to information acquired during a professional relationship formed for nonlitigation purposes. Depending on the circumstances, witness immunity may apply to such testimony and in the specific circumstances of this case it does apply.

¶3 Although witness immunity does not preclude Mr. Wynn's statutory claims, those claims are otherwise barred. First, Ms. Earin was a witness for Mrs. Wynn, whom she had also counseled, and therefore we reject Mr. Wynn's

claims based on Ms. Earin's appearance at the hearing to determine child placement. Second, as to her testimony, we find any challenge to the testimony waived.

¶4 The Court of Appeals also concluded that Mr. Wynn's statutory and malpractice claims are so intertwined that, absent "some principled way to sort out what caused what," *Wynn v. Earin*, 131 Wn. App. 28, 46, 125 P.3d 236 (2005), *review granted*, 158 Wn.2d 1001 (2006), he is entitled to attorney fees under the statute if he establishes the entire series of events that he claims caused his alleged damages. We conclude that because Mr. Wynn is not entitled to a retrial on any claims already dismissed, he is not entitled to all the attorneys fees and costs he seeks. We affirm the trial court's award of attorney fees and costs.

## FACTS

¶5 Beginning in September 1997, Ms. Earin, a certified mental health professional, provided individual counseling to Mr. Wynn followed by joint marital counseling for Wynn and his wife, Cynthia. She assured Mr. Wynn of confidentiality and he provided personal information. Ms. Earin also kept notes and records of the counseling sessions. By May 1998, Mr. Wynn viewed Ms. Earin as being sympathetic to his wife and hostile toward him, so he stopped seeing her. Ms. Earin continued to counsel Cynthia.

¶6 The Wynns began dissolution proceedings, with residential placement of their children in dispute. The court appointed a guardian ad litem for the children, Dr. Kim Chupurdia, PhD. As part of her investigation, Dr. Chupurdia contacted Ms. Earin by telephone. Dr. Chupurdia had obtained written authorizations from both Mr. Wynn and Mrs. Wynn allowing her to obtain information from Ms. Earin. Ms. Earin asked at the beginning of the conversation whether Dr. Chupurdia had a release, and Dr. Chupurdia said she did. However, Ms. Earin herself did not have a release in hand as required by the Health Care Information Act before disclosing confidential information obtained dur-

ing counseling sessions. During the 20-minute conversation with Dr. Chupurdia, Ms. Earin provided a great deal of information, including a recommendation as to who should have custody of the children. She did so from memory because she did not have her records before her. Mrs. Earin maintains that she provided information only with respect to the joint counseling sessions and not information obtained when counseling Mr. Wynn individually. Mr. Wynn maintains she had an "agenda" against him and provided inaccurate information. He says that information in the guardian ad litem's report, derived from the conversation with Ms. Earin, was inaccurate, incomplete, and biased.

¶7 Subsequently, Ms. Earin was subpoenaed by Mr. Wynn's counsel for a deposition. In connection with this deposition, Mr. Wynn also requested his counseling records from Ms. Earin. Mr. Wynn requested the records from Ms. Earin for the purpose of refuting claims she made. In connection with this request, his counsel waived any privilege Mr. Wynn had in communications with Ms. Earin. Mr. Wynn later testified that he understood the waiver applied only for purposes of the deposition. Ms. Earin did not produce the records, first responding that they were not readily accessible. When Mr. Wynn obtained a court order to produce the records, Ms. Earin explained that the records had been stolen from her car.

¶8 At the hearing to determine child placement, Ms. Earin appeared and testified on Cynthia Wynn's behalf, providing information obtained during the counseling sessions. According to Mr. Wynn, she testified to information obtained during his private counseling sessions and exceeded the scope of the questions asked. However, Mr. Wynn did not object to her appearance at the hearing or her testimony on any grounds of privilege, confidentiality, or violation of the Health Care Information Act. The court ordered primary placement of the children with Mrs. Wynn.

¶9 On January 31, 2003, Mr. Wynn brought suit against Ms. Earin for actual damages resulting from alleged viola-

tions of the Health Care Information Act and for malpractice. He also sought attorney fees and costs under the Act. His claims, which overlapped, alleged, among other things, violations arising from Ms. Earin's disclosure of information from the counseling sessions to Dr. Chupurdia without a release in hand, her offer to testify in the hearing to determine child placement, her testimony at the hearing, and her failure to take reasonable safeguards to provide security for Mr. Wynn's counseling records, resulting in their loss. Mr. Wynn alleged that Ms. Earin's conduct constituted a "continuum" of misconduct, proximately causing him emotional distress damages. Ms. Earin denied all violations of the Act and all negligence.

¶10 Prior to trial, Ms. Earin obtained dismissal of claims related to her appearance and testimony at the hearing to determine child placement on the basis that these claims were barred by witness immunity. Accordingly, during the eight-day trial Mr. Wynn pursued his malpractice and statutory claims relating to Ms. Earin's conduct up to the time of the hearing, but he could not assert claims based on conduct after that.

¶11 At the close of evidence, the trial court directed a verdict in Mr. Wynn's favor that Ms. Earin violated the Health Care Information Act by talking to Dr. Chupurdia by phone without having Mr. Wynn's written release. The question whether this was also negligence went to the jury, which found it was negligence but not a proximate cause of any damages.

¶12 The trial court also directed a verdict in Mr. Wynn's favor that leaving his records in an unlocked car, from which they were stolen, violated the Heath Care Information Act and was negligence as a matter of law. The jury determined this was a proximate cause of damages, and awarded $2,790 for economic damages, the amount of counseling expense that Mr. Wynn incurred in treatment by another mental health care provider.

¶13 Mr. Wynn requested $119,432 in attorney fees and $11,006 in costs pursuant to RCW 70.02.170(2). The trial

court segregated the work it thought was necessary to establish the two statutory violations, estimating that this was 10 percent of the total effort, and awarded about $11,900 in fees and $1,100 in costs.

¶14 Mr. Wynn appealed, raising a number of issues. Those relevant at this stage of the proceedings are that the trial court erred in applying witness immunity to Ms. Earin's appearance and testimony at the hearing to determine child placement, and that the trial court erred in awarding only part of the attorney fees and costs requested. The Court of Appeals reversed on both of these issues, holding that the Health Care Information Act prevails over witness immunity as to the statutory claims; that the malpractice claims relating to Earin's appearance and testimony are not barred by the witness immunity rule, either; and that Mr. Wynn may be entitled to unsegregated attorney fees and costs on remand, contingent on a jury's damage award on retrial. *Wynn*, 131 Wn. App. 28.

## ANALYSIS

¶15 The trial court held that witness immunity applies to preclude all of Mr. Wynn's claims founded on Ms. Earin's appearance and testimony at trial. In light of this conclusion, the trial court did not decide other issues regarding these claims. Similarly, the parties raise a number of issues in this court, but as the trial court recognized, it is necessary to address other issues related to a particular claim only if witness immunity does not apply to that claim.

¶16 Turning first, then, to the threshold witness immunity question, Ms. Earin contends that the Court of Appeals erred in holding that disclosure provisions of the Health Care Information Act prevail over the common law witness immunity rule. We agree with the Court of Appeals.

¶17 Whether witness immunity applies is a question of law that is determined de novo by a reviewing court. *Deatherage v. Examining Bd. of Psychology*, 134 Wn.2d 131, 135, 948 P.2d 828 (1997). The general rule is that witnesses

in judicial proceedings are absolutely immune from suit founded on their testimony. *Id.*; *Bruce v. Byrne-Stevens & Assocs. Eng'rs, Inc.*, 113 Wn.2d 123, 125, 776 P.2d 666 (1989). The purpose of this common law rule "is to preserve the integrity of the judicial process by encouraging full and frank testimony." *Bruce*, 113 Wn.2d at 126. Absent immunity, witnesses might self-censor in two ways. They might be reluctant to come forward to testify and they might distort testimony due to fear of subsequent liability. *Deatherage*, 134 Wn.2d at 136-37; *Bruce*, 113 Wn.2d at 126 (quoting *Briscoe v. LaHue*, 460 U.S. 325, 332-33, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983)). In addition, "the rule also rests on the safeguards against false or inaccurate testimony which inhere in the judicial process itself. . . . [R]eliability is ensured by [the witness's] oath, the hazard of cross examination and the threat of prosecution for perjury." *Bruce*, 113 Wn.2d at 126 (citing *Briscoe*, 460 U.S. at 332); *Deatherage*, 134 Wn.2d at 138. These safeguards ensure truthful and accurate testimony. *Deatherage*, 134 Wn.2d at 138.

■ ■ ¶18 In *Bruce*, we held that witness immunity applies not only to testimony, but also to the basis of a witness's testimony, that is, the "acts and communications which occur in connection with the preparation of that testimony." *Bruce*, 113 Wn.2d at 136. Thus, in *Bruce* an engineer hired specifically for litigation purposes was entitled to absolute witness immunity for engineering work he did that formed the basis for his trial testimony. Witness immunity also applies to guardians, therapists, and attorneys who submit reports to family court. *Id.* at 127.

¶19 Ms. Earin argues that when enacting the Health Care Information Act, the legislature did not intend to abrogate traditional common law witness immunity. She relies on *Briscoe*, where the United States Supreme Court reasoned that the witness immunity rule prevented suit under 42 U.S.C. § 1983 against police officers who allegedly gave perjured testimony resulting in a criminal conviction. The Court found no evidence that Congress intended to

abrogate traditional common law witness immunity in § 1983 actions and said that "the common law's protection for witnesses is 'a tradition so well grounded in history and reason' that we cannot believe that Congress impinged on it 'by covert inclusion in the general language before us.'" *Briscoe*, 460 U.S. at 334 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S. Ct. 783, 95 L. Ed. 1019 (1951)). Earin points out neither the Act nor the bill reports mention the witness immunity rule.

 ¶20 The legislature is presumed to know the law in the area in which it is legislating, and statutes will not be construed in derogation of the common law absent express legislative intent to change the law. *Price v. Kitsap Transit*, 125 Wn.2d 456, 463, 886 P.2d 556 (1994); *see Briscoe*, 460 U.S. at 330. Unlike the circumstances in *Briscoe*, here provisions in the Health Care Information Act show that the legislature intended to override the witness immunity rule. RCW 70.02.060 provides in part:

> (1) Before service of a discovery request or compulsory process on a health care provider for health care information, an attorney shall provide advance notice to the health care provider and the patient or the patient's attorney involved through service of process or first class mail, indicating the health care provider from whom the information is sought, what health care information is sought, and the date by which a protective order must be obtained to prevent the health care provider from complying. . . .
>
> (2) Without the written consent of the patient, the health care provider may not disclose the health care information sought under subsection (1) of this section if the requester has not complied with the requirements of subsection (1) of this section. In the absence of a protective order . . . forbidding compliance, the health care provider shall disclose the information in accordance with this chapter. . . .

RCW 70.02.170 provides:

> (1) A person who has complied with this chapter may maintain an action for the relief provided in this section against a health care provider or facility who has not complied with this chapter.

(2) The court may order the health care provider or other person to comply with this chapter. Such relief may include actual damages . . . .

The first of these statutes plainly contemplates that the Act applies when disclosure is sought during or in preparation for judicial proceedings, and the second plainly provides a cause of action for noncompliance with the Act. Thus, the Act shows the legislature's intent to allow a cause of action notwithstanding the witness immunity rule.

¶21 Further, the underlying policy concerns of the Act also show that its provisions outweigh the witness immunity rule. The legislature stated its findings when enacting chapter 70.02 RCW:

(1) Health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests.

. . . .

(3) In order to retain the full trust and confidence of patients, health care providers have an interest in assuring that health care information is not improperly disclosed and in having clear and certain rules for the disclosure of health care information.

(4) Persons other than health care providers obtain, use, and disclose health record information in many different contexts and for many different purposes. It is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers.

(5) The movement of patients and their health care information across state lines, access to and exchange of health care information from automated data banks, and the emergence of multistate health care providers creates a compelling need for uniform law, rules, and procedures governing the use and disclosure of health care information.

RCW 70.02.005. These findings show the importance of the substantive rights that patients and health care providers have under the Health Care Information Act.

¶22 The Act establishes that the legislature intended to override the common law witness immunity rule. As the Court of Appeals recognized, the public policy justification for applying the witness immunity rule is outweighed by the interest in protecting confidential disclosures made during medical treatment. "Consultations with confidential advisors should not require a warning that anything disclosed will be available to potential future litigation adversaries and may be used against the client in court." *Wynn*, 131 Wn. App. at 40.

¶23 Ms. Earin suggests, however, that a separation of powers issue would arise if the legislature intended to abrogate the witness immunity rule, which she characterizes as an aspect of judicial administration. However, the Health Care Information Act provides substantive rights to patients and health care professionals regarding disclosure of health care information, and enforcement of these rights is within the legislature's province.

¶24 We conclude that the Health Care Information Act prevails over the common law witness immunity rule.[1]

¶25 The Court of Appeals also held that witness immunity does not apply to information that the witness acquires in a prelitigation, professional relationship formed for non-litigation purposes. *Id.* at 38-39. Because Ms. Earin's rela-

---

[1] Our conclusion finds support in *Renzi v. Morrison*, 249 Ill. App. 3d 5, 618 N.E.2d 794, 188 Ill. Dec. 224 (1993). There, a psychiatrist who had treated a mother and counseled her on her marriage volunteered to testify in favor of the father at a custody proceeding. The mother's objection to the testimony was overruled, and the psychiatrist revealed communications, testified to results of psychological tests, and offered her opinion of the mother's emotional health. *Id.* at 7. The trial judge found this information " 'tipped the balance of the scale' " in favor of granting temporary custody to the father. *Id.* The mother then filed a damages action against the psychiatrist, who claimed common law witness immunity. The court determined that the confidentiality provisions of Illinois' Mental Health and Developmental Disabilities Confidentiality Act, 740 Ill. Comp. Stat. 110/1-17 (2006), prevailed over the common law witness immunity rule. The court rejected the argument that the legislature had to specifically abolish the witness immunity rule, reasoning that the act showed the legislature intended to modify the common law rule because it provided for a court determination of admissibility of confidential information and provided that any person aggrieved by a violation of the act could bring an action for damages. *Renzi*, 249 Ill. App. 3d at 8.

tionship with the Wynns was formed for nonlitigation purposes, Mr. Wynn's malpractice claims arising from Ms. Earin's appearance and testimony at the hearing to determine child placement would not be barred by the witness immunity rule under the court's holding.

¶26 The Court of Appeals based this holding on the fact that the claims in *Bruce* and *Deatherage* were based on expert witnesses' alleged negligence in preparing reports for use in testimony. *Id.* The Court of Appeals observed that other cases had distinguished situations where health care professionals were retained for purposes of litigation from situations where they provided nonlitigation treatment or care. *Id.* at 38 (citing *Gustafson v. Mazer*, 113 Wn. App. 770, 776-77, 54 P.3d 743 (2002); *Childs v. Allen*, 125 Wn. App. 50, 56, 105 P.3d 411 (2004)). Here, the Court of Appeals said, Ms. Earin acquired the information during the course of treating Mr. Wynn and not with any view toward litigation. *Id.* at 39.

¶27 Ms. Earin first argues the Court of Appeals erred because the common law rule is broad and absolute, citing *Dexter v. Spokane County Health Dist.*, 76 Wn. App. 372, 376, 884 P.2d 1353 (1994), where the court said, "[a]ll witnesses are immune from all claims arising out of all testimony." But while some statements of the rule make it appear to be absolute, it is not. For example, *Deatherage* concerned disciplinary proceedings against an expert witness who allegedly failed to meet professional ethical standards in his work that formed the basis for his testimony in child custody proceedings. We noted that discipline of health care professionals is governed by the Uniform Disciplinary Act, chapter 18.130 RCW, and concluded that the act's language and purpose authorize initiation of disciplinary proceedings when an expert witness's conduct is unprofessional. *Deatherage*, 134 Wn.2d at 139-40. Witness immunity did not apply, given its historic contours and given that " '[u]nderlying the doctrine of absolute immunity is the concept of an alternate if not adequate remedy' " and no alternate remedy was available for the alleged professional

violations at issue. *Id.* at 141 (emphasis omitted) (quoting *Twelker v. Shannon & Wilson, Inc.*, 88 Wn.2d 473, 477, 564 P.2d 1131 (1977)).

■ ■ ¶28 Ms. Earin concedes that witness immunity would not preclude a suit for malpractice arising from treatment simply because the health care professional had been called on to testify in an action. However, she maintains there is a difference between cases where a malpractice claim arises out of treatment and cases where the claim arises out of the health care provider's participation in litigation.

¶29 We agree and conclude the Courts of Appeals' holding that witness immunity does not apply to information acquired in a prelitigation professional relationship formed for nonlitigation purposes is simply too broad. Wynn's negligence claims are not based on misdiagnosis or negligent treatment, but rather on alleged negligence in testifying beyond the scope allowable under applicable standards of care. This kind of testimony is clearly encompassed by the witness immunity rule. Indeed, most testimony involves information that a witness acquired without regard to litigation.

¶30 Further, the policy underpinnings of the witness immunity rule are fully implicated because, as with other witnesses, an expert witness's testimony could be chilled by the threat of potential liability.[2] The witness immunity rule is necessary, as the court has explained, because if witnesses are exposed to suit based on their testimony, they may not be forthcoming, complete, and honest in their testimony. Where health care professionals are concerned, this fear, it can be readily inferred, could lead to the professional's either declining to give expert testimony or, if the expert agrees to testify, providing cautious, qualified answers that are so wishy-washy as to be unhelpful to the

---

[2] In many instances an expert witness may be subject to disciplinary action for violation of ethical or other professional standards, thus providing an alternate remedy for misconduct, which is also one of the underpinnings of witness immunity.

jury. The testimony might also be shaded to avoid offense. Exposure to suit could threaten the legal system, which relies on witnesses being willing to testify fully and honestly without threat of suit.

¶31 For example, in this case, if witness immunity did not apply, then, by failing to circumscribe her testimony as the plaintiff contends she should have to conform to the standard of care he proposes, Ms. Earin would face potential liability for giving complete testimony. The same would be true for any witness in similar circumstances.

¶32 However, we distinguish between a claim of negligence based on the witness's testimony, as in this case, and a claim of negligent diagnosis or treatment. We emphasize that a health care professional is not immune from suit for negligent *diagnosis* or *treatment* merely because he or she has been a witness whose testimony touched on that treatment. Here, for example, if Mr. Wynn had sued Ms. Earin for negligence in counseling him, she would not enjoy witness immunity preventing his suit merely because she testified about that treatment during the course of a child placement hearing. Also, a health care provider cannot, by testifying in a court proceeding about treatment, thereby immunize himself or herself from a malpractice suit based on negligent diagnosis or treatment.

¶33 The witness immunity rule, which provides that witnesses in judicial proceedings are immune from suit based on their testimony, is a centuries' old rule. Witness immunity preserves the integrity of judicial proceedings by encouraging full and forthright testimony, as this court has recognized. Our case law on the subject is outlined in this opinion, but other jurisdictions have also recognized the enormous importance of the witness immunity rule, or "litigation privilege" as it is also called, to judicial proceedings.

¶34 The California Supreme Court explained the purposes of the rule (which is codified in that state):

> The principal purpose of [the litigation privilege] is to afford litigants and witnesses the utmost freedom of access to the

courts without fear of being harassed subsequently by derivative tort actions.

[The rule] promotes the effectiveness of judicial proceedings by encouraging "open channels of communication and the presentation of evidence" in judicial proceedings. A further purpose of the privilege "is to assure utmost freedom of communication between citizens and public authorities whose responsibility is to investigate and remedy wrongdoing." Such open communication is "a fundamental right to the right of access to judicial and quasi-judicial proceedings." Since the "external threat of liability is destructive of this fundamental right and inconsistent with the effective administration of justice," courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings. . . .

. . . [W]itnesses should be free from the fear of protracted and costly lawsuits which otherwise might cause them either to distort their testimony or refuse to testify altogether.

. . . .

. . . [I]n immunizing participants for liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result.

*Silberg v. Anderson*, 50 Cal. 3d 205, 213-14, 786 P.2d 365, 266 Cal. Rptr. 638 (1990) (citations omitted) (quoting *McClatchy Newspapers, Inc. v. Superior Court*, 189 Cal. App. 3d 961, 970, 234 Cal. Rptr. 702 (1987); *Imig v. Ferrar*, 70 Cal. App. 3d 48, 55, 138 Cal. Rptr. 540 (1977); *Pettitt v. Levy*, 28 Cal. App. 3d 484, 490-91, 104 Cal. Rptr. 650 (1972)).

¶35 The United States Supreme Court has similarly explained the importance of the witness immunity rule. " '[T]he dictates of public policy . . . require[ ] that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible.' " *Briscoe*, 460 U.S. at 333 (quoting *Calkins v. Sumner*, 13 Wis. 193, 197 (1860)).

The Court has also explained, " '[C]ontroversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another. . . . Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.' " *Butz v. Economou*, 438 U.S. 478, 512, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978) (second alteration in original), *quoted in Briscoe*, 460 U.S. at 335. Ultimately, the rule protects litigants, whose interests at stake in a case range across the entire spectrum of property, family, and individual circumstances, by encouraging the full, truthful, and complete testimony of witnesses.

. ¶36 The witness immunity rule also rests on other safeguards against false or inaccurate testimony, including the witness's oath, cross-examination, and the possibility of prosecution for perjury. In addition to these remedies and safeguards, an expert witness may be subject to professional disciplinary proceedings. Indeed, in *Deatherage*, we held that the witness immunity rule does not bar disciplinary proceedings against a psychologist based on work performed as an expert witness in a child custody dispute. We expressly noted that a disciplinary proceeding is not a civil suit against the expert and the policies underscoring the witness immunity rule do not apply. *Deatherage*, 134 Wn.2d at 138. We noted that other jurisdictions' case law confirms that while civil liability is not available, professional discipline may be appropriate, citing, in particular, *Silberg*, where absolute immunity for an attorney did not prohibit professional discipline, *Moses v. Parwatikar*, 813 F.2d 891 (8th Cir. 1987), where absolute immunity for a psychiatrist barred a suit for monetary damages but did not prohibit other corrective action, and *Moses v. McWilliams*, 379 Pa. Super. 150, 157 n.7, 549 A.2d 950 (1988), where

absolute immunity for a physician did not prohibit professional discipline. *Deatherage*, 134 Wn.2d at 140.[3]

¶37 We considered in *Deatherage* policy considerations attending to both the witness immunity rule and professional disciplinary proceedings. Because this case involves a health care professional, the Health Care Information Act provides for a cause of action for the failure to conform to its requirements, which protect confidential patient information. This is in addition to potential professional discipline. Overwhelming authority[4] gives weight to the witness im-

---

[3] Such professional discipline is no small matter. An attorney, for example, may be subject to a range of discipline, including suspension from the practice of law, or, in egregious situations, disbarment. Even if the attorney is not prevented from the practice of law for a period of time, he or she can also face the loss of professional reputation that comes with lesser forms of discipline.

[4] *E.g., Briscoe*, 460 U.S. 325. The following are just some of the decisions in which courts have recognized the witness immunity rule, although not all versions of the rule are identical. *Gilbert v. Sperbeck*, 126 P.3d 1057 (Alaska 2005); *Silberg*, 50 Cal. 3d at 212; *Action Apartment Ass'n v. City of Santa Monica*, 41 Cal. 4th 1232, 1241-50, 163 P.3d 89, 63 Cal. Rptr. 3d 398 (2007); *Wagner v. Bd. of County Comm'rs*, 933 P.2d 1311 (Colo. 1997); *Rioux v. Barry*, 283 Conn. 338, 927 A.2d 304 (2007); *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380 (Fla. 2007); *Overman v. Klein*, 103 Idaho 795, 799-801, 654 P.2d 888 (1982); *Jurgensen v. Haslinger*, 295 Ill. App. 3d 139, 692 N.E.2d 347, 229 Ill. Dec. 574 (1998); *Hutchinson v. Lewis*, 75 Ind. 55 (1881); *Sampson v. Rumsey*, 1 Kan. App. 2d 191, 194, 563 P.2d 506 (1977) (citing *Marney v. Joseph*, 94 Kan. 18, 20, 145 P. 822 (1915)); *Jefferson County Commonwealth Attorney's Office v. Kaplan*, 65 S.W.3d 916, 921 (Ky. 2001); *Stone v. Glass*, 35 S.W.3d 827 (Ky. App. 2000); *Marrogi v. Howard*, 2001-1106 (La. 01/15/02), 805 So. 2d 1118, 1124-27; *Reichardt v. Flynn*, 374 Md. 361, 366-72, 823 A.2d 566 (2003); *Sriberg v. Raymond*, 370 Mass. 105, 108, 345 N.E.2d 882 (1976); *Fisher v. Lint*, 69 Mass. App. Ct. 360, 366, 868 N.E.2d 161 (2007); *Maiden v. Rozwood*, 461 Mich. 109, 133-35, 597 N.W.2d 817 (1999); *Meyer v. Hubbell*, 117 Mich. App. 699, 709, 324 N.W.2d 139 (1982); *Daoud v. De Leau*, 455 Mich. 181, 565 N.W.2d 639 (1997); *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302, 306-07 (Minn. 2007); *Murphy v. A.A. Mathews*, 841 S.W.2d 671 (Mo. 1992); *Beckenhauer v. Predoehl*, 215 Neb. 347, 349-50, 338 N.W.2d 618 (1983); *Drew v. Davidson*, 12 Neb. App. 69, 73-76, 667 N.W.2d 560 (2003); *Commercial Ins. Co. of Newark v. Steiger*, 395 N.J. Super. 109, 118-19, 928 A.2d 126 (2007); *Provencher v. Buzzell-Plourde Assocs.*, 142 N.H. 848, 853-57, 711 A.2d 251 (1998); *Sinrod v. Stone*, 20 A.D.3d 560, 561, 799 N.Y.S.2d 273 (2005); *Allan & Allan Arts Ltd. v. Rosenblum*, 201 A.D.2d 136, 615 N.Y.S.2d 410 (1994); *Godette v. Gaskill*, 151 N.C. 52, 65 S.E. 612 (1909); *Riemers v. O'Halloran*, 2004 ND 79, 678 N.W.2d 547, 551-52; *Willitzer v. McCloud*, 6 Ohio St. 3d 447, 448-49, 453 N.E.2d 693 (1983); *Kirschstein v. Haynes*, 1990 OK 8, 788 P.2d 941, 947-54; *Hammett v. Hunter*, 189 Okla. 455, 456-58, 117 P.2d 511 (1941); *Wallulis v. Dymowski*, 323 Or. 337, 348, 918 P.2d 755 (1996); *Wollam v. Brandt*, 154 Or. App. 156, 961 P.2d 219 (1998); *LLMD of Mich., Inc. v. Jackson-Cross Co.*, 559 Pa. 297, 302, 740 A.2d 186 (1999); *Binder v. Triangle Publ'ns, Inc.*, 442 Pa. 319, 323-24, 275 A.2d 53 (1971);

munity rule. Our existing case law, to which we adhere in this decision, is thus widely supported.

¶38 We hold that the witness immunity rule applies to bar Mr. Wynn's malpractice claims arising from Ms. Earin's appearance and testimony at the hearing to determine child placement. Accordingly, Mr. Wynn's malpractice claims grounded in Ms. Earin's appearance and testimony at the hearing were properly dismissed by the trial court.

¶39 Next, Ms. Earin argues that if witness immunity does not apply to her testimony for purposes of Mr. Wynn's claims under the Health Care Information Act, these claims were still properly dismissed because Mr. Wynn waived his statutory rights relative to her testimony.

¶40 Before turning to this question, we first address Ms. Earin's appearance at trial. Mr. Wynn bases some statutory claims on her "offer" to testify at trial. However, Ms. Earin appeared on behalf of Mrs. Wynn, for whom she had provided counseling. Mrs. Wynn was entitled to present Ms. Earin as a witness on her behalf. Accordingly, and notwithstanding the fact Ms. Earin had also treated Mr. Wynn, we conclude Mr. Wynn cannot base a claim on her appearance at trial.

¶41 With regard to Ms. Earin's testimony, she maintains that waiver resulted when Mr. Wynn signed a broadly worded written consent form authorizing release of all mental health information to the guardian ad litem; that his attorney waived any privilege for purposes of Ms. Earin's deposition testimony; and that waiver occurred because Mr. Wynn failed to object at the hearing to determine child placement to her presence or to her testimony on any ground implicating the rights set out in the Health

*Logan's Super Mkts., Inc. v. J.B. McCalla, Ragland, Potter & Co.*, 343 S.W.2d 892 (Tenn. 1961); *Cooley v. Galyon*, 109 Tenn. 1, 70 S.W. 607 (1902); *Bird v. W.C.W.*, 868 S.W.2d 767 (Tex. 1994); *5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254 (Tex. Ct. App. 2004); *DeBry v. Godbe*, 1999 UT 111, 992 P.2d 979; *Politi v. Tyler*, 170 Vt. 428, 751 A.2d 788 (2000); *Darnell v. Davis*, 190 Va. 701, 58 S.E.2d 68 (1950); *Wilson v. Bernet*, 218 W. Va. 628, 631-35, 625 S.E.2d 706 (2005); *Bromund v. Holt*, 24 Wis. 2d 336, 341-42, 129 N.W.2d 149 (1964); *Churchill v. WFA Econometrics Corp.*, 2002 WI App. 305, 258 Wis. 2d 926, 932, 655 N.W.2d 505; *Elmore v. Van Horn*, 844 P.2d 1078, 1084-86 (Wyo. 1992).

Care Information Act or any health care provider-patient privilege, i.e., he did not object to any question on the basis of confidentiality, privilege, or violation of the Health Care Information Act.

■■ ■■ ¶42 We decline to reach the questions whether, on this record, the consent form waived any rights beyond release of information to the guardian ad litem or whether waiver for purpose of the deposition extended beyond that purpose. However, we conclude that waiver occurred when Mr. Wynn did not object to Ms. Earin's testimony at the custody proceeding on the ground that it implicated rights under the Health Care Information Act. Generally, statutory rights can be waived, and in the analogous area of the statutory physician-patient privilege, RCW 5.60.060(4), this court has held that a person who permits his physician to testify without objection waives the privilege as to that physician. *McUne v. Fuqua*, 42 Wn.2d 65, 74, 253 P.2d 632, 257 P.2d 636 (1953) (citing *Williams v. Spokane Falls & N. Ry.*, 42 Wash. 597, 84 P. 1129 (1906)). Similarly, we conclude that by failing to object to Ms. Earin's testimony on the ground that it violated the Health Care Information Act, Mr. Wynn waived his confidentiality rights under the Act.

¶43 In any event, we are also not convinced that Mr. Wynn could establish any damages resulting from any violation of the Act resulting from Ms. Earin's testimony. As explained, the trial court directed a verdict in Mr. Wynn's favor that the loss of his records constituted a violation of the Act. The jury thereafter determined that this loss was a proximate cause of damages in the amount of $2,790, the amount Mr. Wynn paid for another counselor to treat his emotional distress. The jury did not award noneconomic damages, however. We believe this shows the jury would not have awarded additional damages for a further violation of the Act, assuming, for argument's sake, that Mr. Wynn had not waived any right to complain about Ms. Earin's testimony and showed a further violation resulted when Ms. Earin testified. Under the jury's verdict, Mr. Wynn was compensated for his emotional distress.

¶44 Finally, we address the issue of attorney fees. The Health Care Information Act provides for an award of reasonable attorney fees and other expenses reasonably incurred by the prevailing party. RCW 70.02.170(2). Mr. Wynn requested over $130,000 in attorney fees and costs. The trial court said that it was "very difficult to segregate work on the statutory violation issue and plaintiff's counsel's time sheets are not very helpful in this exercise." Clerk's Papers (CP) at 1074 (letter ruling filed Jan. 8, 2004). The trial court observed that while it was mindful of the public policy underlying chapter RCW 70.02 RCW, "the fee must still bear a rational relationship to the work that needed to be done to bring about the result." CP at 1074. The court explained:

> I have reviewed the time sheets and as best I can determine 10% of the time can be allocated to ascertaining the events that occurred, speaking on the phone with the Guardian Ad Litem and theft of the medical records, and analyzing them in the context of a statutory violation. The balance of the work appears to be on the negligence claims that went to the jury as well as the dismissed claims. The reasonable costs incurred would include those items directly related to ascertaining a statutory violation, i.e., discovery deposition costs.

*Id.* The court awarded $11,943 in fees and $1,100 in costs. Significantly, the trial court's award recognized that establishing the two statutory violations justified an award of fees and costs, despite the fact that the jury found that no damages flowed from Ms. Earin's conversation with the guardian ad litem.

¶45 The Court of Appeals reversed. While acknowledging that Wynn was entitled to fees and costs for successful claims under the Health Care Information Act but not to an award for success on his negligence claims, the court reasoned that the statutory and malpractice claims Mr. Wynn asserts are inextricably intertwined. The Court of Appeals said that unless there is a principled way to segregate the claims, Wynn is entitled to argue to the jury that the ultimate emotional distress was proximately caused by

a series of acts and conditions. *Wynn*, 131 Wn. App. at 45-46 (citing *Caughell v. Group Health Coop. of Puget Sound*, 124 Wn.2d 217, 233-34, 876 P.2d 898 (1994)).[5] The court directed remand for a determination of an award of attorney fees and costs "contingent on a jury's damage award upon retrial." *Wynn*, 131 Wn. App. at 46-47.

¶46 Because we hold that Mr. Wynn has no actionable claim related to Ms. Earin's appearance at trial, that he waived his statutory claims relating to Ms. Earin's testimony, and that his malpractice claims related to that testimony are precluded by the witness immunity rule, there are no remaining claims to be tried. Nonetheless, Mr. Wynn urges the court to affirm the Court of Appeals. He maintains that the private cause of action authorized by the Health Care Information Act is a private attorney general action, and the purpose of the fee statute is to make it financially feasible for private individuals to litigate violations of the Act. *See, e.g., Fahn v. Cowlitz County*, 95 Wn.2d 679, 684-85, 628 P.2d 813 (1981); *Martinez v. City of Tacoma*, 81 Wn. App. 228, 235, 914 P.2d 86 (1996). Therefore, he urges, the attorney fee provision should be liberally construed to encourage private enforcement of the law. *See Blair v. Wash. State Univ.*, 108 Wn.2d 558, 570, 740 P.2d 1379 (1987). He analogizes this case to cases involving the Industrial Insurance Act, Title 51 RCW, where workers' compensation claims are viewed as "unitary claims" and the overall degree of recovery is inconsequential in determining an attorney fee award. *See Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 989 P.2d 1111 (1999).

¶47 Mr. Wynn maintains that because he successfully established some violations of the Act, i.e., Ms. Earin's release of information to the guardian ad litem without the authorization required by the Act and her loss of his counseling records, segregating these claims or the acts causing these claims is contrary to the purposes of the Act.

---

[5] The Court of Appeals' reliance on *Caughell* is misplaced because it involved a claim of a negligent course of treatment, unlike the situation here where legally distinct claims involve a common set of facts.

He adds that the Act does not require proof of damages for an attorney fee and costs award to be made, and thus the amount of damages awarded does not necessarily indicate whether attorney fees should be awarded and what constitutes a reasonable fee. *See* RCW 70.02.170.

¶48 We do not agree that success on one claim under the Health Care Information Act will justify, under a private attorney general theory, an attorney fees and costs award for multiple claims on which a plaintiff is unsuccessful. The act specifically provides that "[t]he court shall award reasonable attorneys' fees and all other expenses *reasonably incurred* to *the prevailing party.*" RCW 70.02-.170(2) (emphasis added). We interpret this by its plain language to mean that attorney fees and costs are awardable only when actually incurred for claims on which the plaintiff prevails. We do not agree with Mr. Wynn's contention that claims under the Health Care Information Act are unitary claims like those we recognized in *Brand.* As the court explained in *Brand,* the statute at issue provided for attorney fees on appeal where the sole issue was whether the degree of the worker's injury had been adequately assessed; only one set of facts was involved and related legal issues. *Brand,* 139 Wn.2d at 673. The court distinguished this type of unitary claim from cases where a discrete series of claims is involved. *Id.* The court also noted that the statute did not suggest that overall success was a factor in determining an award and no evidence suggesting that fees must be limited to successful claims. *Id.* at 669. Here, contrary to the Court of Appeals' reasoning, there are separate and distinct violations of the Health Care Information Act that give rise to an attorney fee award.

¶49 Accordingly, the trial court's award of attorney fees is affirmed. The trial court was hampered, as the court indicated, by time sheets that were not very helpful. Nonetheless, the trial court's conclusion that 10 percent of counsel's time was spent on those statutory claims that were successful is justified by the record.

## CONCLUSION

¶50 The Health Care Information Act overrides the common law witness immunity rule, and therefore claims based on violations of the Act are not foreclosed by the witness immunity rule where the claims are based on a witness's testimony. The Court of Appeals' holding that information obtained during a professional relationship formed for nonlitigation purposes is not subject to the witness immunity rule is too broad. The witness immunity rule may apply to information gathered during the course of a professional relationship entered into for nonlitigation purposes, depending upon the circumstances. Here, Mr. Wynn's claims against Ms. Earin for malpractice were not related to her treatment of him, but rather to her appearance and testimony at trial. Under these circumstances, the witness immunity rule applies with respect to these claims, foreclosing them.

¶51 Although Mr. Wynn's claims under the Health Care Information Act are not foreclosed by the witness immunity rule, they are barred for other reasons. First, Ms. Earin appeared as Mrs. Wynn's witness, and Mr. Wynn therefore cannot complain about her appearance at trial. Second, with regard to Ms. Earin's testimony, Mr. Wynn failed to object to this testimony on the ground that it violated the Health Care Information Act. His failure to object constituted an implied waiver of his rights under the Act.

¶52 We reverse the Court of Appeals' holding that witness immunity never applies to testimony relating to information acquired during a professional relationship formed for nonlitigation purposes. We affirm the Court of Appeals' holding that the witness immunity rule does not apply to information disclosed in violation of the Health Care Information Act. Mr. Wynn's claims under the act are otherwise

barred. We affirm the trial court's award of attorney fees and costs.

ALEXANDER, C.J.; C. JOHNSON, OWENS, FAIRHURST, and J.M. JOHNSON, JJ.; and BRIDGE, J. PRO TEM., concur.

¶53 CHAMBERS, J. (concurring) — I agree with the majority that Pardner Wynn effectively waived his statutory and malpractice claims relating to Jolene Earin's testimony. Majority at 383. I write separately because, in my view, Mr. Wynn's waivers render much of the majority opinion unnecessary.

¶54 Mr. and Ms. Wynn were involved in an emotional dissolution, in which the placement of their children was in dispute. One of Mr. Wynn's claims involved a conversation between Ms. Earin and the children's guardian ad litem, Dr. Kim Chupurdia, PhD. Mr. Wynn claims confidential information was divulged by Ms. Earin which caused him harm. However, Mr. Wynn had specifically authorized Ms. Earin to provide otherwise confidential information to Dr. Chupurdia.[6] At Ms. Earin's deposition, Mr. Wynn, through counsel, also specifically waived any claim of privilege. At the hearing to determine child placement, Mr. Wynn was present with counsel and made no objection to Ms. Earin's testimony based upon any claim of confidentiality or violation of the Health Care Information Act, chapter 70.02 RCW. I concur with the majority that when a person is a party to a hearing and present at a proceeding where testimony is offered, the party is obligated to object to the disclosure of confidential information or any claim based upon a claim of confidentiality may be waived.

¶55 I also write to emphasize that our opinion today largely concerns the truthful testimony of a witness in response to direct questions. Priests, lawyers, doctors, counsel-

---

[6] I am mindful that Ms. Earin did not have the release signed by Mr. Wynn before her when she talked to Dr. Chupurdia, but the jury must have concluded that such a technical failure was not the proximate cause of any harm to Mr. Wynn.

ors, and others are still prohibited from disclosing sacred privileges. Nothing in our opinion today necessarily applies to documents, including affidavits and declarations. Nor do we purport to hold that a witness may disclose the confidences of a person not a party to the proceedings or not present at the proceeding.

¶56 With these observations, and because I conclude that Mr. Wynn waived his statutory and malpractice claims, I concur in the result.

SANDERS, J., concurs with CHAMBERS, J.

Reconsideration denied July 10, 2008.